LINDER, S. J.
*165 In this landlord-tenant case, plaintiff (landlord) brought this contract action against defendants, former tenants (tenants), for unpaid rent and other damages.[1] Tenants asserted two counterclaims in response. The first was for damages based on landlord's alleged failure to maintain the dwelling in a habitable condition. The second sought relief based on landlord's failure to give an abandoned property notice before disposing of items that tenants left on the premises after they vacated it. Sitting as finder of fact, the trial court rejected tenants' counterclaims and awarded landlord most, but not all, of the unpaid rent and damages that landlord sought. Tenants appeal, assigning error to the dismissal of each of their counterclaims. We affirm.
I. BACKGROUND
A. Factual Evidence
The facts at trial were disputed, particularly as they bear on tenants' counterclaims. Applying our familiar standard of review, we consider the evidence in the light most favorable to the explicit and implicit findings of the trial court. See L&M Investment Co. v. Morrison , 286 Or. 397, 399, 594 P.2d 1238 (1979) (viewing evidence in landlord-tenant dispute in light most favorable to trial court's resolution as trier of fact). We describe countervailing evidence to the extent that it provides helpful context.
In November 2013, landlord and tenants entered into a month-to-month tenancy for a two-story residence with three bedrooms and two bathrooms. The written rental agreement included, as an addendum, a lengthy list itemizing landlord's personal property that was included with the rental, such as a *1103 refrigerator, microwave oven, toaster, *166 washer and dryer, lawnmower, and numerous household and yard items. The agreed rent was $1,400 a month, due on the first of each month, with late charges of $10 a day if not paid by the fifth of each month. Under the rental agreement, tenants were responsible for reimbursing landlord for city water utility charges, for abiding by all city ordinances, and for performing all tenant obligations under ORS chapter 90 (Oregon Residential Landlord and Tenant Act). Tenants also agreed to pay various move-in charges and deposits, which landlord agreed to let them pay in installments after taking possession.
Within a few days of moving in, tenants gave landlord a written list of items that they believed needed repair in the residence. That list included "water backup in [the] bathroom drain downstairs." Landlord repaired the drain and took care of the other issues on the list, except as landlord and tenants otherwise agreed.
Several months into the tenancy, around March 2014, tenants called landlord because the downstairs shower drain had backed up. Within a few hours of that call, landlord went to the residence to fix the backup and to help with any cleanup. Landlord cleared the line by using an "expander bulb" which, when inserted down the drain and into the sewer line, uses pressure from a water hose to clear any blockage. The water from the backup was contained in and around the bathroom floor drain, in an area of at most four square feet, which was damp with water that was less-than-a-pencil's width (or about one-eighth inch) deep. Landlord cleaned up the residual dampness and then left. Before leaving, he gave the tenants the "expander bulb" plumbing tool in case the drain got blocked again. The landlord had not had any problems with the downstairs plumbing since undertaking some major repairs to the sewer line in 2007.[2] No tenants after that, until these tenants, had alerted him to any problems with the downstairs plumbing. Landlord believed that, after he cleared the line, tenants should have *167 no problem with it, but in his experience, tenants sometimes put inappropriate items down the toilet and into the sewer lines. Landlord urged tenants to "review what materials are going into the sewer line that could cause the blockage" and suggested that they might want to use the plumbing tool every couple of months to help prevent any blockage.
From the outset of the tenancy, tenants struggled to afford the $1,400 in rent, and they generally tendered their payments late, or not in full, or both. Five or six months into the tenancy, in May 2014, tenants tendered landlord a payment of only $175. In an accompanying letter, tenants urged landlord to reduce the monthly rent because the costs of rent, garbage, oil, electricity, and utilities made it "so very expensive" for them to live there. Tenants implored landlord, who they knew "[isn't] a heartless man," to "please, please consider lowering it to a more reasonable cost since there is so much repair to be done" in terms of "leaks and flooding in the basement." They concluded saying, "Please, please think about it * * * we would very much appreciate it if you could lower it."
Landlord replied in writing, stating that he would not consider an adjustment in the rent until tenants paid him the unpaid move-in charges, back rent, and unpaid utility charges. He reminded tenants that they had assured him when they moved in that they could easily cover rent and utilities and would pay him the move-in charges within a few months, none of which had been paid. Tenants had also told landlord that there would be other individuals assisting them economically and that they would obtain "county assistance"; landlord asked tenants why those things were not happening. Landlord concluded with: "You must pay the remainder of the May rent, plus another $200 for utilities, this month, so that we do not fall farther behind. I am willing to work with you but I need your help too."
*1104 A few days later, tenants paid landlord $1,200. In the months that followed, tenants continued to pay the rent late, sometimes only partially, and sometimes not at all. In October 2014, landlord wrote tenants again about their increasing debt of unpaid rent, move-in charges, and utility charges. Landlord advised tenants that he could no *168 longer afford to allow a bigger balance to build up and that they must pay him $1,420 in October, and also give him an "intended payment schedule." Tenants paid only partial rent in October and November, and then paid no rent at all in December 2014 and January 2015.
In mid-January 2015, tenants wrote landlord and left him a phone message informing him that the downstairs shower drain had again backed up. In the written letter sent to landlord, tenants said that "this will make it about the 6th or 7th time this has happened since we have lived here." Landlord returned the phone call within an hour and sent a letter acknowledging tenants' letter and phone message. In the letter, landlord confirmed that he had called in response to their message and talked to a member of tenants' family, who said that, using the plumbing tool landlord had left with tenants, they "immediately broke up some blockage in the line" and solved the problem. Landlord's letter said he was not aware that there had been six or seven other blockages, advised tenants to consider reviewing "what materials are going into the sewer line that could cause the blockage," and urged them, if a blockage occurred again, to immediately cease using the plumbing and to clear the line by using simple water pressure. Tenants' January 2015 letter was the first notice of any kind that landlord received about the shower drain problem after the one call he responded to in March 2014, a few months after tenants first moved in. Tenants did not respond to landlord's letter.
Tenants continued to default on their payments. They did not tender any partial or late rent payments, nor any payments for water bills or other charges. Landlord then brought an eviction action against tenants. In that proceeding, tenants agreed to vacate the premises by a specified date and to pay landlord $1,400. They did not pay the $1,400, and stayed in possession over a month past the stipulated move-out date. Landlord was about to pursue his remedies for eviction when one of the tenants "begged for another week to get things out" of the residence and offered to pay landlord $300 for that additional week. Landlord agreed. Tenants never paid the $300, but they were gone at the end of the additional week. Tenants did not give landlord notice that they had vacated. Landlord could not remember the *169 exact date when he discovered that they had moved out, but it was sometime in April 2015, possibly early that month.
Landlord inspected the premises after tenants vacated. Some of the personal property included with the rental, such as the refrigerator, a heavy-duty washing machine, and the toaster, were gone. Other items, such as the lawnmower, were "destroyed." Still other items, such as some of the blinds and other fixtures, were damaged and had to be repaired. Tenants left behind a pile of debris in the yard that, earlier, had resulted in a city nuisance citation and $451 fine for which tenants never reimbursed landlord. The debris was to have been removed from the yard, but instead, landlord found it left at the side of the house, under a tarp. Landlord took four pickup loads to the dump to dispose of the debris. After landlord repaired and replaced the damaged property, and cleaned up the yard, another person moved into the residence. That person experienced no problems with the downstairs shower drain, despite regular usage of both the upstairs and downstairs bathrooms and heavy usage of the washing machine.
Tenants presented evidence in support of their counterclaims, evidence that the trial court not only disbelieved, but that also contributed to the court's conclusion that tenants' counterclaims were ill-motivated. According to tenants' evidence, the problem caused by the downstairs shower drain was severe and tenants incurred significant property damage because of it. Tenants and their witnesses described the backups as persistent *1105 and frequent.[3] Tenants claimed that they had repeatedly complained to landlord verbally about the problem, and that landlord had done nothing in response, other than tell them to clear the line with the "expander bulb," which rarely helped for long. According to tenants, when a blockage in the line occurred, sewage-contaminated water backed up through the drain and entered the basement, creating an unsanitary and "disgusting" mess to clean up. Tenants described the backups, at their worst, as resulting in flooding several inches *170 deep, almost like "a lake" in the basement, that flowed out of the bathroom, into the adjacent bedroom, and into other areas of the basement. Tenants asserted that, during one "really bad" backup, sewage-contaminated water flowed to the far side of the basement, where they had personal clothing and other items stored in boxes, ruining many possessions.[4] Tenants acknowledged that they did not tell landlord about the damaged personal possessions;[5] that they did not take photographs or otherwise attempt to document the damages to their personal property; and that they did not have receipts or other evidence to corroborate their claims of property loss.[6] They took no steps to document their losses even though they estimated the value of the ruined possessions at $8,590.[7] In tenants' opinion, the residence was not livable and either had no rental value throughout the tenancy or had at most some partial rental value at the start of the tenancy. Yet tenants remained on the premises for over a year and pursued no legal avenues to remedy the condition that they claimed made the residence unfit for occupancy.
B. The Trial Court's Resolution of the Parties' Claims
After tenants vacated the premises, landlord brought this contract action seeking damages of $13,540.55 for amounts that tenant owed landlord but never paid (rent, late charges, the city fine, and utility charges). Landlord also sought damages for costs that he incurred in replacing and repairing the personal property included with the premises, and damages for cleaning up the property after tenants vacated it.
*171 Tenants counterclaimed. Their first counterclaim sought damages based on landlord's failure to maintain the residence in habitable condition. In particular, and relying principally on the alleged drainage backups,[8] tenants sought "diminished rental value" of $16,800 ($1,400 per month for 12 months) and $8,590 for the damages to their personal possessions allegedly caused by the shower drain backups, for a total damage award of $25,390. Tenants' second counterclaim sought various statutory remedies, including relief from unpaid rent, for landlord's failure to give tenants "an abandoned property notice" before disposing of the items left in the yard.
The trial court found in favor of landlord on landlord's claims, and dismissed tenants' counterclaims. We discuss several aspects of *1106 the trial court's decision at greater length in our analysis of tenants' assignments of error. To summarize, the trial court first found that tenants failed to pay monthly rent in the total amount claimed by landlord, which was $8,110.00. The trial court, however, declined to award landlord rent for April 2015, the month that tenants vacated the property, because of the uncertainty under the evidence whether tenants vacated the property in early April or later in the month. The court therefore reduced the unpaid rent award to landlord by $1,400.00, resulting in an award of $6,710.00. Next, the trial court found that tenants failed to pay late charges of $1,525.00, water utility charges in the amount of $1,453.55, and the city fine in the amount of $451.00; the trial court therefore awarded those amounts to landlord. Finally, the trial court awarded landlord damages for personal property repairs and replacement, and cleanup of the premises. In making that award, the trial court declined to use landlord's replacement value for the personal property that was missing or irreparably damaged, and instead awarded landlord current use value of $1,000.00. *172 On tenants' counterclaims, without elaboration, the court denied their claim for "personal property damages" based on the items that allegedly were damaged by the drainage backups. The trial court also denied tenants' second counterclaim, noting that tenants were "not asking for a value" to be placed on the items that landlord hauled to the dump, and declining on that basis to relieve tenants of unpaid rent. As to tenants' counterclaims in general, the trial court made the express finding that "this is a case about the tenants not wanting to pay the agreed-upon rent as opposed to any deficiency by the landlord in his actions on this case." The trial court then summarized its award, stating that it would award landlord the amounts it had specified, for a total judgment in favor of landlord of $11,139.55.
II. ANALYSIS
On appeal, tenants assign error to the trial court's dismissal of each of their counterclaims. We consider the issues raised by those assignments of error in turn.
A. Did the trial court erroneously determine that tenants were required by statute to give landlord written notice in order to counterclaim for diminished rental value?
In their first assignment of error, tenants argue that the trial court erroneously dismissed their counterclaim for damages based on their failure to give landlord statutory written notice of the need to make repairs. According to tenants, the trial court applied the wrong statute to their claim and no written notice to landlord was required.
The pertinent statutes are part of the Oregon Residential Landlord and Tenant Act (ORLTA), which governs the obligations, rights, and remedies of landlords and tenants in residential tenancies. ORS 90.100 - 90.940 ; see generally Napolski v. Champney , 295 Or. 408, 414-15, 667 P.2d 1013 (1983) (discussing history of ORLTA). Among the duties that the act imposes on landlords is the affirmative obligation to maintain a dwelling in "habitable condition." ORS 90.320(1).[9] A landlord's noncompliance with that obligation *173 may trigger a tenant's entitlement to one or more of several remedies, each of which is subject to certain terms and conditions. See generally L&M Investment Co. , 286 Or. at 399, 594 P.2d 1238 (discussing remedial policies and provisions of ORLTA).
Here, two remedial statutes potentially apply. The first, ORS 90.360(2), permits a tenant to seek damages and an injunction for a habitability violation. No written notice is required, but if the landlord does not have actual or constructive notice of the habitability violation, and if the tenant knows or reasonably should know of the violation, then the tenant must give the landlord actual notice in a reasonable time before incurring damages.[10] Under the second statute, *1107 ORS 90.365(1), written notice is a prerequisite for seeking certain specified statutory remedies, including self-help remedies, when a landlord intentionally or negligently fails to supply an "essential service."[11] More specifically, after giving the landlord notice "specifying the breach" and allowing the landlord a reasonable opportunity to supply the essential service, the tenant may, on the various terms that the statute specifies, repair the condition and deduct the cost of repairs from rent, recover damages based on diminution of the dwelling's fair rental value, and withhold all rent and obtain comparable substitute housing *174 at the landlord's expense.[12] To recover damages under either statute, a tenant may either initiate an action against the landlord or assert a counterclaim for damages in an action brought by the landlord. Napolski , 295 Or. at 418, 667 P.2d 1013 (involving eviction proceeding). In operation, those provisions "provide a rent withholding remedy" to a tenant, who can refuse to pay rent due to an alleged habitability violation, wait for the landlord to file an eviction or other action based on the unpaid rent, and then counterclaim for diminished rental value damages as an offset to the landlord's claim. Id. ; Amatisto v. Paz , 82 Or. App. 341, 345, 728 P.2d 42 (1986).
Finally, for landlords and tenants alike, the right to a remedy under ORLTA is qualified by the "general directive" that the remedies provided by the act "shall be so administered that an aggrieved party may recover appropriate damages" and the aggrieved party "has a duty to mitigate damages." ORS 90.125(1) (emphasis added); Brewer v. Erwin , 287 Or. 435, 438-41, 600 P.2d 398 (1979) (discussing *175 identical text of predecessor statute, former ORS 91.725(1) (1977), renumbered as ORS 90.125(1) (1989) ; *1108 characterizing it as a "general directive"). In addition, ORS 90.130"imposes an obligation of good faith" that is "a prerequisite to [asserting] the rights and remedies under the act." Napolski , 295 Or. at 419, 667 P.2d 1013. In the context of a tenant who withholds rent based on an alleged habitability violation, that statutory good faith obligation protects a landlord against "[s]purious, frivolous, or improperly motivated counterclaims" asserted to justify the withheld rent. Napolski , 295 Or. at 419, 667 P.2d 1013. As a result, when a tenant seeks to offset unpaid rent through such a counterclaim, the question of a tenant's good faith or bad faith can be, depending on the factual circumstances, "the heart of the matter." Amatisto , 82 Or. App. at 346, 728 P.2d 42.
That overview of the statutory scheme provides context for tenants' first counterclaim and the trial court's resolution of it. Tenants alleged that the property had "no rental value for the last 12 months of the tenancy," and that, due to the drainage backups, they had incurred personal property damages of nearly $9,000. Consistently with their position that the residence was unfit for occupancy and had no rental value, tenants' counsel argued to the trial court that landlord's failure to ensure proper drainage in the downstairs bathroom qualified as a failure to provide an "essential service." Tenants' counterclaim, however, pleaded damages under ORS 90.360(2), which applies to habitability violations generally, not ORS 90.365(1), the statute that provides special remedies, including self-help remedies, for essential service violations.
The trial court began by announcing its ruling on landlord's claims, in which it made specific findings on the amounts that tenants failed to pay for rent, utilities, and city fines; the court then awarded damages in those amounts. Next, the trial court found that tenants damaged landlord's property, placed a value on that property, and awarded landlord that additional amount of damages. The trial court then turned to tenants' counterclaims. In resolving tenants' first counterclaim, the court stated:
"I find the defendants did not comply with 90.365(1) and did not properly notify the landlord of problems, as required *176 by that statute in writing. As a result, the tenants unlawfully withheld rent and are with unclean hands.
"The tenants' personal property damage claim is denied. * * *
"Furthermore, I find that this is a case about the tenants not wanting to pay the agreed-upon rent as opposed to any deficiency by the landlord in his actions on this case."
The trial court concluded by summarizing the terms on which it would be entering judgment for landlord and asking if the parties had questions about its ruling. Tenants' counsel responded by emphasizing that tenants were electing to proceed under ORS 90.360(2), not ORS 90.365(1) : "Our claim is not under that statute. It is under [ORS] 90.360(2)." The trial court responded:
"There was a requirement to withhold rent, that the tenant notify the landlord of specific deficiencies in the property, and that is required to be done in writing. That was not done. As a result, your client is here with unclean hands.
"The failure of paying rent changed the entirety of this case. Had your client decided to pay rent, she would be in a very different position vis-à-vis any claim that she brings before the court. The choice to withhold the rent triggers a requirement, and that requirement was not followed through with."
The trial court asked tenants' counsel if he had further questions; counsel said, "No."
On appeal, tenants argue that they were entitled to pursue their damages counterclaim under ORS 90.360(2), which does not require written notice, regardless of their ability to pursue a remedy under ORS 90.365, which does. In tenants' view, the trial court effectively held that ORS 90.365, the essential services statute, was their exclusive remedy and that they were not entitled to seek general damages under ORS 90.360(2). Tenants maintain that the trial court, in taking that view of the statutes, legally erred.
In response, landlord emphasizes the trial court's express finding that the case was "about the tenants not wanting to pay the *1109 agreed-upon rent as opposed to any *177 deficiency by the landlord in his actions on this case." Landlord urges that the trial court was entitled to consider tenants' failure to provide written notice to landlord under the "essential services" statute and to conclude from that failure that tenants were pursuing their claim under ORS 90.360 with "unclean hands."
As framed by tenants, the issue is one of statutory interpretation that presents a legal question of first impression. As earlier noted, cases interpreting the ORLTA have held that tenants have an "implicit" rent withholding remedy that stems from their right, in a landlord's action for eviction or unpaid rent, to counterclaim for diminution of rental value damages caused by a landlord's failure to maintain a residence in habitable condition. Napolski , 295 Or. at 418, 667 P.2d 1013 ; see also Amatisto , 82 Or. App. at 345, 728 P.2d 42 (ORLTA "operates" to provide rent withholding as a remedy for habitability violations). No reported case, however, has involved damages sought under ORS 90.360(2) for a general habitability violation, when the alleged violation also amounts to a failure to supply an "essential service" that falls within specific remedial provisions of ORS 90.365. As a result, no case has decided whether a tenant may always forgo those specific remedies, which require giving a landlord written notice and an opportunity to cure, and proceed under the general damages provision of ORS 90.360(2) instead.
We decline to resolve that question of statutory interpretation in this case, however, for two reasons. First, the answer is important to landlords and tenants alike, but the parties have not offered us developed arguments on the point, nor have they analyzed the question using the familiar methodology that our courts follow in interpreting statutes. See State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009) (court determines legislative intent by examining a statute's text, context, and any pertinent legislative history).
Second, and more fundamentally, the trial court's factual finding that tenants' counterclaim was motivated by a desire to avoid paying rent, rather than by any deficiency in landlord's maintenance of the dwelling, fully resolves tenant's counterclaim, regardless of which statute applies. Assuming, as tenants argue, that a tenant may elect to forgo *178 any remedy under the "essential services" statute and to pursue a remedy under ORS 90.360(2) instead, the tenant nevertheless must act in "good faith." ORS 90.130 ; Napolski , 295 Or. at 419, 667 P.2d 1013 (statute imposes an obligation of good faith as a prerequisite to asserting the rights and remedies under ORTLA).
Here, the trial court in essence found that tenants had not brought their counterclaims in good faith. As landlord argues, in making that finding, the trial court was entitled to consider tenants' failure to avail themselves of a remedy that potentially could have remedied a condition that they now claim made the dwelling unfit for occupancy and valueless as a rental.[13] Rather than alert landlord to the alleged deficiency in writing and forewarn landlord that they would withhold rent or engage in other self-help actions, as the "essential services" statute requires, tenants instead told landlord that they were struggling financially and repeatedly asked landlord to lower the rent. The trial court, sitting as finder of fact, concluded from the evidence that tenants' counterclaim was motivated by the desire to avoid their obligation to pay rent, not a desire to remedy a habitability issue with the premises. That finding on the trial court's part defeats tenants' counterclaim, regardless of whether tenants were entitled to pursue damages under ORS 90.360(2) or were limited to the "essential services" remedies in ORS 90.365(1). See Commonwealth Property Management, Inc. v. Hanson , 94 Or. App. 136, 141-42, 764 P.2d 950 (1989) (trial court did not err in rejecting tenants' counterclaims where record supported finding that they were asserted in bad faith); see generally Napolski , 295 Or. at 419, 667 P.2d 1013 (statutory duty to act in good faith means that "[s]purious, frivolous, or improperly motivated counterclaims may not be used to justify a tenant's rent withholding"). Consequently, *1110 the trial court did not err in dismissing tenants' first counterclaim.[14] *179 B. Did landlord have a duty to give tenants a notice of abandoned property before disposing of items that remained on the property after tenants vacated it?
As earlier described, tenants' second counterclaim was based on landlord's disposal of items that tenants left in the yard, next to the side of the house, under a tarp. Tenants asserted that landlord was obligated to give tenants a statutorily prescribed "abandoned property notice" and an opportunity to reclaim the property before disposing of it. Because landlord failed to do that, tenants asserted they were entitled to a remedy under ORS 90.425, including relief from any liability for the $8,110 of unpaid rent sought by landlord.
As relevant here, the statute that tenants rely on, ORS 90.425, provides:
"(2) A landlord is responsible for abandoned personal property and shall store, sell or dispose of abandoned personal property as provided by this section. ***
"(3) Prior to storing, selling or disposing of the tenant's personal property under this section, the landlord must give a written notice to the tenant * * * ."
After giving the tenant the required notice,[15] a landlord must "store" the property "in a place of safekeeping" and exercise "reasonable care" for the property. ORS 90.425 (7)(b). The only exceptions under the statute are for "rotting food," which the landlord may "promptly dispose of," and *180 pets or livestock, which may be turned over to an animal control agency that is willing to accept them. ORS 90.425 (7)(b)(A), (B). If the tenant does not remove the abandoned property within 15 days, and if the property is below a specified fair market value, the landlord may, among other actions, "destroy or otherwise dispose" of it. ORS 90.425 (10)(b)(B). Finally, ORS 90.425(17)(a) provides that, if a landlord does not comply with the statute,
"[t]he tenant is relieved of any liability for damage to the premises caused by conduct that was not deliberate, intentional or grossly negligent and for unpaid rent and may recover from the landlord up to twice the actual damages sustained by the tenant[.]"[16]
Both at trial and on appeal, tenants argue that "personal property" within the meaning of the statute includes property of any kind, including trash, debris, and garbage. "There is no exception," tenants urge, "for trash" or other items that have no value. The trial court rejected that understanding of the statute, and so do we, as we will explain.
*1111 We begin with text. Although neither party's brief discusses it, the term "personal property" as used in the abandoned property statute is defined to "mean[ ] goods, vehicles and recreational vehicles" and certain manufactured dwellings and floating homes. ORS 90.425(1)(g). Because the definition specifies what the term "means" rather than what it "includes," the term "personal property" is limited to the enumerated items. See Pilgrim v. Clatskanie People's Util. Dist. , 149 Or. App. 234, 238-39, 942 P.2d 821 (1997) (discussing significance of "means" versus "includes" in definitional statutes). The only enumerated item that *181 even arguably applies in this case is "goods." Thus, to be "personal property" within the meaning of the abandoned property statute, the trash, debris, and garbage left on the premises in this case must qualify as "goods." See generally State v. Couch , 341 Or. 610, 617, 147 P.3d 322 (2006) (court is "obliged to apply the legislature's definition" to statutory terms).
The legislature did not, however, define the term "goods" in a way that sheds light on its meaning in this context.[17] We therefore look to its common usage. See Gaines , 346 Or. at 175, 206 P.3d 1042. "Goods," when used as a plural noun, ordinarily means "tangible movable personal property having intrinsic value usu[ally] excluding money and other choses in action but sometimes including all personal property ***." Webster's Third New Int'l Dictionary 978 (unabridged ed. 2002). Although the term goods can "sometimes" include all personal property, the statutory context precludes that meaning for purposes of the abandoned property provisions. In effect, that interpretation would make the definition circular: The term "personal property" would simply mean "all personal property," which would render the legislature's use of the term "goods" superfluous.[18]
The remaining interpretative issue is whether "goods" includes trash, debris, and other garbage. For two reasons, the answer under the abandoned property statute is no.
*182 First, debris, trash, and other items of that kind typically have no economic or intrinsic value. They therefore do not satisfy the ordinary understanding of the term "goods." Second, and in all events, ORLTA imposes distinctive rights and duties on landlords and tenants where debris, trash, and similar items are involved. Under ORS 90.325(1)(b), tenants have an affirmative duty to keep all areas of the leased or rented premises "free from all accumulations of debris, filth, rubbish, garbage, rodents and vermin[.]" See also id. (tenant shall reasonably cooperate with assisting landlord in any reasonable effort to remedy the problem); ORS 90.325 (1)(c) (tenant shall dispose of all garbage, rubbish, and other waste in a clean, safe, and legal manner). As part of the obligation to maintain residential premises in habitable condition, landlords have same duty. ORS 90.320(1)(f). Those provisions are context for interpreting the abandoned property statute. PGE v. Bureau of Labor and Industries , 317 Or. 606, 611, 859 P.2d 1143 (1993) (context includes related statutes). It would make no sense to interpret the abandoned property statute to require a landlord to store or otherwise safeguard debris, trash, and garbage so that a tenant who has violated the duty to keep the premises clear of such items can recover them.
*1112 The only remaining question is whether the items that landlord disposed of in this case amounted to trash, debris, and similar garbage. Here, the record arguably compels an affirmative answer as a matter of law. The items that landlord disposed of were the same items that, while they were in the yard, had violated the city's nuisance ordinance and resulted in a fine that tenants stipulated was their responsibility.[19] Even assuming, however, that the answer is not compelled as a matter of law by the city's citation and fine, it is still the only answer that the record supports. There was no testimony or other evidence that would support (let alone legally compel) a finding that the items *183 disposed of by landlord were anything other than trash, debris, and garbage.[20]
In sum, landlord was not obligated to give abandoned property notice under ORS 90.425 before disposing of the trash and debris that tenants left on the premises. Tenants therefore were not entitled to a remedy under ORS 90.425(17)(a), including relief from their unpaid rent obligation. The trial court did not err in dismissing tenants' second counterclaim.
Affirmed.

The action originated in small claims court and was brought against three named former tenants-a husband and wife, and the wife's mother. The husband and the wife's mother were dismissed from the case by the small claims court. The remaining defendant, the wife, requested a jury trial, which caused the case to be transferred to circuit court. The circuit court judgment likewise dismissed the two nonappearing defendants and judgment was entered against the wife only. Many of the relevant actions were taken by one or more of the three originally named defendants in the action. For ease of reference, therefore, unless it matters to distinguish between them, we refer to them as "tenants" in the plural.

The modifications and repairs in 2007 involved excavating and modifying the sewer line from the house to the street, improving the grade as much as possible, installing cleanout access so that the line could be easily cleared if there were a clog in it, and installing an air-pressure assisted toilet in the basement to ensure a strong flow into the sewer lines.

In describing the backups, tenants and their witnesses were often inconsistent in various particulars, including their descriptions of the frequency of the backups, which ranged from every few months, to monthly, to multiple times a week.

Tenants' evidence was inconsistent as to whether the more severe flooding that allegedly damaged their possessions occurred within the first two or three months of the tenancy or later.

Actually, one witness claimed to have overheard his mother, one of the tenants, tell landlord about the damage done to tenants' personal possessions. His mother testified, however, that she never told landlord about that damage.

For example, tenants claimed that the ruined property included many items that had been gifted to them, such as four Coach purses worth $200 new, and two robes purchased at Saks Fifth Avenue. Tenants could not remember, however, who gave them those and many other items allegedly ruined by the drainage backup.

In their application to rent the premises, tenants represented that they carried renter's insurance. Nothing in the record suggests that tenants made a claim for insurance coverage for the allegedly ruined possessions.

As part of their allegation, plaintiffs also asserted that a fan in the bathroom leaked during the rainy season, that there was a leak in the kitchen sink plumbing, and that a windstorm had caused a leak in the garage roof. They did not claim any property damage based on those alleged problems, and at trial, they relied principally on the evidence about the drainage backups in support of their claim that the property was not habitable.

As pertinent to this case, a landlord's duty to maintain a dwelling in habitable condition includes substantially providing "[p]lumbing facilities that conform to applicable law in effect at the time of installation, and [are] maintained in good working order." ORS 90.320(1)(b).

ORS 90.360(2) provides:
"Except as provided in this chapter, the tenant may recover damages and obtain injunctive relief for any noncompliance by the landlord with the rental agreement or ORS 90.320 or 90.730. The tenant shall not be entitled to recover damages for a landlord [sic ] noncompliance with ORS 90.320 or 90.730 if the landlord neither knew nor reasonably should have known of the condition that constituted the noncompliance and:
"(a) The tenant knew or reasonably should have known of the condition and failed to give actual notice to the landlord in a reasonable time prior to the occurrence of the personal injury, damage to personal property, diminution in rental value or other tenant loss resulting from the noncompliance; or
"(b) The condition was caused after the tenancy began by the deliberate or negligent act or omission of someone other than the landlord or a person acting on behalf of the landlord."

As relevant to the premises involved in this case, ORS 90.100(13)(a) defines "essential service" to include "plumbing" and "[a]ny other service or habitability obligation *** the lack or violation of which creates a serious threat to the tenant's health, safety or property or makes the dwelling unfit for occupancy." As we later discuss, tenants' position at trial was that the drainage backup condition was a failure to provide an essential service as well as an unhabitability issue more generally.

ORS 90.365(1) provides:
"If contrary to the rental agreement or ORS 90.320 or 90.730 the landlord intentionally or negligently fails to supply any essential service, the tenant may give written notice to the landlord specifying the breach and that the tenant may seek substitute services, diminution in rent damages or substitute housing. After allowing the landlord a reasonable time and reasonable access under the circumstances to supply the essential service, the tenant may:
"(a) Procure reasonable amounts of the essential service during the period of the landlord's noncompliance and deduct their actual and reasonable cost from the rent;
"(b) Recover damages based upon the diminution in the fair rental value of the dwelling unit; or
"(c) If the failure to supply an essential service makes the dwelling unit unsafe or unfit to occupy, procure substitute housing during the period of the landlord's noncompliance, in which case the tenant is excused from paying rent for the period of the landlord's noncompliance. In addition, the tenant may recover as damages from the landlord the actual and reasonable cost or fair and reasonable value of comparable substitute housing in excess of the rent for the dwelling unit. For purposes of this paragraph, substitute housing is comparable if it is of a quality that is similar to or less than the quality of the dwelling unit with regard to basic elements including cooking and refrigeration services and, if warranted, upon consideration of factors such as location in the same area as the dwelling unit, the availability of substitute housing in the area and the expense relative to the range of choices for substitute housing in the area. A tenant may choose substitute housing of relatively greater quality, but the tenant's damages shall be limited to the cost or value of comparable substitute housing."

The failure to pursue the remedies under ORS 90.365(1) is also potentially relevant to a tenant's obligation to mitigate damages under ORS 90.125(1).

Belatedly, in their reply brief, tenants assert that the trial court was not entitled to rely on its "unclean hands" finding because the doctrine of unclean hands applies only in equitable cases and must be affirmatively raised in defense. There are two problems with tenants' argument. First, it is unpreserved. Although tenants' counsel specifically objected to the trial court's reliance on the written notice requirement of ORS 90.365(1), tenants' counsel voiced no objection to the trial court's determination that tenants pursued their claims with "unclean hands," even when the trial court expressly invited objections. Second, the label that the trial court used is not dispositive. What matters is the gravamen of the trial court's finding. The trial court used "unclean hands" as a short-hand for its express finding that tenants were improperly motivated in bringing their damages counterclaim. On appeal, tenants have not assigned error to the trial court's finding in that regard, and they particularly have not challenged it as unsupported by the record as a whole. The trial court's finding of bad faith, however labeled, is binding on appeal.

Among other things, the notice must advise the tenant of a specific date by which the tenant must contact the landlord to arrange for removal of the property (five days if the notice is personally served; eight days if the notice is mailed).ORS 90.425(5) (specifying contents of notice); ORS 90.425(6)(b) (specifying dates that must be included in notice).

In pleading the second counterclaim, tenants asserted that the items disposed of by landlord "had a value to be proved at the time of trial," and requested, in addition to relief from unpaid rent, relief in the form of twice the actual damages sustained by the disposal of the property. Tenants abandoned their request for double damages at trial, conceding that the evidence did not support placing any value on the property. Tenants' second counterclaim also requested relief from any liability for damage to landlord's personal property. Tenants have not abandoned that argument, but neither have they pressed it. That request for relief fails, in all events, for the same reasons that tenants are not entitled to relief for unpaid rent.

In ORS 90.425(1)(c), the legislature, without actually defining the term "goods," has specified which goods, based on where they are located, come within the abandoned property statute (i.e. , " 'Goods' includes those goods left inside a recreational vehicle, manufactured dwelling or floating home or left upon the rental space outside" of one of those dwellings.). Nothing in that provision aids in determining the legislature's intended meaning of "goods" for purposes of this case.

That interpretation would also nullify several amendments to the statute and return it to a former version. As originally enacted, the statute applied to abandoned "goods, chattels or personal property" without defining any of those terms. Or. Laws 1973, ch. 559, § 27(1) (codified as former ORS 91.840(1) ). In 1997, the legislature deleted "goods and chattels" from the original subsection (1) of the statute, leaving only the term "personal property." Or. Laws 1997, ch. 577, § 25(2). Simultaneously, however, the legislature added a definition of personal property by declaring that the term "includes goods, vehicles, recreational vehicles" and certain "manufactured dwellings and floating homes." Or. Laws 1997, ch. 577, § 25(1)(e). The more expansive term "includes" was replaced the next session with "means." Or. Laws 1999, ch. 603, § 28.

The city's notices of violations specifically directed the removal of all the "junk, trash, and debris" from the property. The city's eventual citation was based on an ordinance that addresses "nuisances affecting public health" and prohibits "[a]ccumulations of debris, rubbish, manure, and junk, junk machinery, or junk vehicles of any kind, inoperable vehicles, and other refuse located on private property that are not removed within a reasonable time." Milwaukie Municipal Code 8.04.070B (Debris on Private Property).

Tenants do not directly argue otherwise. Tenants do, however, assert that the trial court nevertheless attributed some value to the items, thus requiring the trial court to treat them as "personal property" that required abandoned property notice. In particular, tenants rely on the trial court's comment, in denying the second counterclaim, that "any value that could be placed on" the abandoned items was "encapsulated" in the $1,400 unpaid rent that the trial court declined to award landlord. Seizing on that remark, tenants assert that the court "awarded tenants some damages for the abandoned property as part of her reduction for the April rent." The trial court, however, did no such thing. The court expressly declined to award that $1,400 to landlord even though rent was technically owing if tenants spent so much as the first day of the month in the premises. The court did so, consistently with its authority under ORS 90.125(1) to award only "appropriate damages," because the evidence did not adequately establish when in April tenants vacated the premises. After the court declared that it would not award the $1,400 to landlord as part of the unpaid rent damages, the court considered tenants' claims, including the abandoned property claim. The court denied that claim and then, as an aside, made the "feel-good" statement to tenants that the $1,400 April rent not awarded to landlord likely covered any amount of value that the disposed of property may have had. That statement provides no basis to treat the $1,400 as award of damages to tenants for the abandoned property rather than what it was-an amount of unpaid rent that the trial court declined to award to landlord.